Perry McAninch
Law Graduate
Immigration Law Unit
The Legal Aid Society
199 Water St., 3rd Floor
New York, NY 10038
T: (212) 577-3393
F: (646) 619-4314
PMcAninch@legal-aid.org

**DETAINED**

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### UNITED STATES IMMIGRATION COURT
### NEW YORK, NY

_____
                                            )
In the Matter of:                           )
                                            )
**Ramatu KIADII**                           )     A# 097-421-333
                                            )
    In removal proceedings.              )
_____)

Immigration Judge Thomas Mulligan      Next Hearing: February 21, 2018, at 8:30 a.m.

**RESPONDENT'S MOTION TO TERMINATE**

**I.     PRELIMINARY STATEMENT**

Respondent Ramatu Kiadii Soko ("Ms. Kiadii" or "Respondent"), through counsel, respectfully moves to terminate the pending removal proceedings with prejudice. The Court should terminate these proceedings because the Department has failed to prove Ms. Kiadii is an alien. The preponderance of the evidence establishes Respondent's claim that she is a United States citizen ("USC"), having derived citizenship under former Section 321(a)(3) of the Immigration and Nationality Act ("INA" or "the Act"). Furthermore, pursuant to its own guidance, the Department should be ordered to immediately release the Respondent pending the resolution of this motion. *See* Tab 48, U.S. Immigration and Customs Enforcement, Policy Number 16001.2, *Superseding Guidance on Reporting and Investigating Claims* (Nov. 10, 2015) (requiring release of an individual where "evidence before the agency tends to show that the individual may, in fact, be a U.S. citizen").

**II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY**

Ms. Kiadii was born on November 12, 1972, in Monrovia, Liberia. Her parents are Henry Kiadii and Louise Roberts. *See* Tab E, Birth Certificate of Ramatu Kiadii. Her mother belongs to the Bassa ethnic group, and her father belongs to the Vai ethnic group. They married on July 26, 1969, in a legally recognized traditional Liberian custom, when Henry Kiadii paid Louise Roberts's dowry, (also known as a "bride price") to her family. *See* Tab C, Declaration of Louise Roberts. Henry Kiadii and Louise Roberts had two children together—Respondent, and her brother, Desire Kiadii. Desire was born on August, 28, 1971.

Approximately six months after Ms. Kiadii was born, her father legally separated from his wife, and left Liberia to move to the United States. *See* Tab C; Tab B, Declaration of Ramatu

1

Soko. He never returned to live in Liberia, and only visited Liberia occasionally to see his children. *See id*.

After her father left Liberia, Ms. Kiadii and her brother initially remained with their mother. *See id*. During a trip to Liberia in 1979, Ms. Kiadii's father expressed that he wanted to bring her and her brother to the United States to live with him. *See* Tab C. In 1983, her mother also left Liberia, leaving Ms. Kiadii with a relative. *See* Tab B; Tab C. Soon after being left by her mother, when she was only ten-years old, Mr. Kiadii's father demanded that she and her brother join him and live in his custody in the United States. She recalls the joyful reunion with her father as he and his family greeted her at the airport, and brought her to live in his custody.

After moving to the United States, Ms. Kiadii and her brother lived with their father, and were in his legal custody. *See id*. Ms. Kiadii's father became a naturalized United States Citizen on August 14, 1987. *See* Tab M, Copy of the Certificate of Naturalization of Henry Kiadii, dated August 14, 1987. At the time, Ms. Kiadii was 14 years old, and had lived with her father in the United States since her arrival.

On or about December 11, 2017, Ms. Kiadii was detained by Immigration and Customs Enforcement ("ICE") and placed into removal proceedings via a Notice to Appear ("NTA") dated October 23, 2017. *See* Tab A at 4, Notice to Appear. DHS charges Ms. Kiadii as removable on the grounds that 1) under INA § 212(a)(6)(A)(i), she is present in the United States without being admitted or paroled; and 2) under INA § 212(a)(2)(A)(i)(I), she has been convicted of a crime involving moral turpitude. *See id*.

**III.   LEGAL ARGUMENT**

Once an NTA has been filed with the Court, proceedings may be terminated where the respondent is a citizen of the United States. *See Matter of Cruz*, 15 I&N Dec. 236 (BIA 1974);

*see also* Tab R at 48, *Superseding Guidance on Reporting and Investigating Claims* (stating that, as a matter of law, the government "cannot assert its civil immigration enforcement authority to arrest and/or detain a U.S. citizen," and has no authority to remove a USC from the country).

In the instant case, proceedings should be terminated because the evidence submitted establishes by a preponderance that Respondent is a USC. Furthermore, pursuant to its own guidance, the Department should be ordered to immediately release the Respondent pending the resolution of this motion, because "probative evidence" exists – an even lower standard than the preponderance required for proceedings to be terminated – indicating that she is a USC. *See* Tab R at 48, *Superseding Guidance on Reporting and Investigating Claims* (requiring release of an individual where "evidence before the agency *tends to show that the individual may*, in fact, be a U.S. citizen") (emphasis added).

    A.    <u>These Proceedings Must be Terminated Because Ms. Kiadii Is a United States Citizen</u>.

The Department bears the burden of establishing alienage by "clear, unequivocal, and convincing evidence." *Woodby v. INS*, 385 U.S. 276, 286 (1966). The Supreme Court has continually held that alienage is a jurisdictional prerequisite to any order of deportation. *See, e.g.*, *Kessler v. Strecker*, 307 U.S. 22, 35 (1939) (holding that jurisdiction in the executive to order removal exists only if the person arrested is an alien); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (same). Thus, a claim of citizenship, as a denial of an essential jurisdictional fact, may be tendered at any point during proceedings. Although a respondent born abroad is presumed to be an alien, such a presumption is rebuttable in the event evidence is produced to establish a claim U.S. citizenship by a mere preponderance of the evidence. *See Matter of Tijerina–Villarreal*, 13 I&N Dec. 327, 330 (BIA 1969); *Matter of A-M-*, 7 I&N Dec. 332, 336 (BIA 1956). The relatively low preponderance of the evidence standard only "requires that the evidence

demonstrate that the applicant's claim is 'probably true,' where the determination of 'truth' is made based on the factual circumstances of each individual case." *Matter of Chawathe*, 25 I&N Dec. 369, 376 (BIA 2010) (citing *Matter of E-M-*, 20 I&N Dec. 77, 79-80 (BIA 1989).

Respondent has established by a preponderance of the evidence that she is a USC. Under the applicable law in effect at the time of Mr. Kiadii's naturalization, a "child born outside of the United States of alien parents…[became] a citizen of the United States upon fulfillment of the following conditions:

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of the parents is deceased; or

(3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins to reside permanently in the United States while under the age of eighteen years.

INA § 321(a), *repealed by* Pub.L. 106-395, Title I, § 103(a), Oct. 30, 2000, 114 Stat. 1632. Respondent derived U.S. citizenship on the last of the required conditions under INA § 321(a), her father's naturalization on August 14, 1987. *See* Tab M, Certificate of Naturalization of Henry Kiadii. As discussed in detail below, on that date, Respondent had already satisfied all the other conditions required by INA § 321(a)(3).

      1.    *Respondent's Parents Were Legally Married According to Recognized Liberian Customs*.

A marriage is valid for immigration purposes if it is valid in the jurisdiction where it was celebrated. *Matter of Hosseinian*, 19 I&N Dec. 453 (BIA 1987) (holding that "[t]he well-established rule is that it is the function of the state to determine how its residents may enter into the marital relationship"); *Matter of Bautista*, 16 I&N Dec. 602, 603 (BIA 1978) (holding that the petitioner's marriage was valid for immigration purposes, because it complied with the law of the Philippines, which was the place of celebration); *Matter of Arenas*, 15 I&N Dec. 174, 174–75 (BIA 1975) (holding that, where the petitioner's prior marriage was dissolved after the subsequent marriage, the subsequent marriage's validity should be analyzed under the law of the place where it was celebrated).

In her declaration, Respondent's mother, Louise Roberts, states that she and Henry Kiadii married on July 26, 1969, via traditional Liberian custom complying with customary local law. Tab C at 11. The marriage was formally finalized when Henry paid Louise's dowry to her family. *Id*. That this practice is legally recognized in Liberia is demonstrated through the declaration of Dr. John Singler, Professor Emeritus of Linguistics at New York University, and expert in Liberian culture, in which he describes the nature of Liberia's legal system:

> Liberia has a dual legal system. As specified in the Liberian Constitution, both statutory (i.e. western) and customary law are recognized. This includes separate statutes regarding marriage. Customary marriage among the Vai and among indigenous Liberian ethnic groups more generally is achieved by the payment of a dowry (also called a "bride-price") by a man to the family of the woman whom he is thereby marrying. There is usually a formal presentation of the sum by the groom and his relatives to the bride's family, but there is no fixed ritual. The defining element of the marriage is the payment of the bride price, however this is carried out.

5

Tab D at 15.[1] He further notes that, at the time of Respondent's parents' marriage, there was "tradition of registering or recording a customary marriage or the dissolution of a customary marriage." *Id*. He describes how, in circumstances such as those presented here, where "1) a man pays a woman's dowry to her family; 2) the couple has two children together; 3) approximately four years after the dowry was paid, the man leaves the country, abandoning the wife and children; and 4) the man never returns—it would be agreed by Liberian authorities and all concerned parties that the couple had been legally married." *Id*. at 16.

    2. *Respondent's Parents Legally Separated According to Recognized Liberian Customs*.

In addition, Respondent has demonstrated that her parents legally separated through legally-recognized Liberian custom. Under *Brissett v. Ashcroft*, the requirement of a "legal separation" under section 321(a)(3) is met where the separation is recognized in the jurisdiction where the marriage took place. 363 F.3d 130, 134 (2d Cir. 2004) (holding that "a divorce or a legal separation recognized by the state with jurisdiction over the marriage would clearly suffice under [section 321(a)(3)]," because the definition of "legal separation" is "in part dependent on the laws of the state or nation with jurisdiction over the marriage").

In his expert Declaration, Dr. John Singler explains that:

> With regard to the dissolution of a customary marriage: it is not unusual for a customary marriage to end, but a formal proceeding to accomplish or ratify this is rare. When there is a formal divorce proceeding (for example, because a wife has "confessed" the name of a lover, or because of excessive domestic violence), it ordinarily consists of an ad-hoc meeting of elders, including representatives of the wife's and husband's families. I have never heard of such a

---

[1] It is well settled that expert evidence that is relevant and reliable can be relied upon by an Immigration Judge in reaching the conclusion of a case. *See Matter of Marcal Neto*, 25 I&N Dec. 169, 176 (BIA 2010) ("Immigration Judges, like other trial judges generally, are often required to determine factual disputes regarding matters on which they possess little or no knowledge of substantive expertise, and, in making such determinations, they typically rely on evidence, including expert testimony, presented by the parties.") *See also United States v. Duncan,* 42 F.3d 97, 101 (2d Cir. 1994).

6

>  proceeding taking place following abandonment in a customary marriage. With or without a formal proceeding, abandonment brings about the legal dissolution of the marriage.

Tab D at 15.

Respondent's mother and father separated in exactly the manner described by Dr. Singler. In her declaration to the Court, Louise Roberts states:

> In 1973, approximately 6 months after Ramatu was born, Henry left Liberia and moved to the United States. At this time, we separated as husband and wife. I knew we were separated because he did not ever plan on coming back to me, and in fact he never returned to live in Liberia. He only came every once in a while to visit his children.

Tab C. As stated *supra*, in examining circumstances such as these, Dr. Singler states, "it would be agreed by Liberian authorities and all concerned parties that the couple had been legally married and were now no longer legally married." *Id*.

The legal separation of the Respondent's parents is further evidence from the fact that both legally remarried in the United States. *See* Tab Q, Marriage Certificate of Louise Roberts (demonstrating that she re-married on September 18, 1997); Tab B at 8 (stating that Henry Kiadii re-married in the 1980s).

        3.    *Respondent Was in the Legal Custody of Her Father at the Time of His Naturalization*.

In *Garcia v. USICE*, the Second Circuit articulated a two-step test for analyzing custody in the context of derivative citizenship. 669 F.3d 91 (2d Cir. 2011). First, the Court must "determine whether a judicial decree or statutory grant awards custody to the naturalizing parent." *Id*. at 95 (citing *Bagot v. Ashcroft*, 398 F.3d 252, 268–69 (3d Cir.2005)). Where no such decree or grant exists, the Court must determine who had "actual contested custody" of the child. *Id*. at 97 (citing *Matter of M-*, 31 I&N Dec. 850 (BIA 1950)). The court further explained that the

"[t]wo predominant indicators of 'actual uncontested custody' are (i) the child's physical residence, and (ii) consent to custody by the non-custodial parent." *Id*.

The BIA has repeatedly held that "a child who has satisfied the statutory conditions of former section 321(a) of the Act before the age of 18 years has acquired United States citizenship, regardless of whether the naturalized parent acquired legal custody of the child before or after the naturalization." *Matter of Douglas*, 26 I. & N. Dec. 197, 198 (BIA 2013) (citing *Matter of Baires*, 24 I&N Dec. 467 (BIA 2008)). Furthermore, a respondent claiming citizenship under section 321(a)(3) need not establish that they were in the custody of the parent at the time that the parent naturalized, but rather only that they came into the parent's sole legal custody prior to their eighteenth birthday, and that the parent naturalized at some point prior to their eighteenth birthday. *Baires*, 24 I&N at 468-69.

Here, Respondent was clearly in the custody of her father prior to her eighteenth birthday. Though no formal decree or grant of custody was ever made to Respondent's father, Respondent was in his actual, uncontested custody. After Respondent's mother moved to the United States and abandoned Respondent and her brother, Respondent's father actively arranged for them to be brought into the United States to live with him. Both Respondent and her mother state that Respondent lived with him from her arrival in May, 1983, until she began high school. *See* Tab B at 9; Tab C at 12. Moreover, it is clear that Respondent's mother relinquished Respondent to her father's custody, as she made no attempts to reclaim custody of Respondent. *Id*. As such, the two requirements of "actual uncontested custody" are clearly met in this case.

    4. *Respondent Began to Reside Permanently in the United States While under the Age of 18.*

Section 321(a)(5) of the Act required that a child deriving citizenship reside "in the United States pursuant to a lawful admission for permanent residence at the time of the

8

naturalization of…the parent naturalized under clause [section 321(a)(3)], or thereafter begin[] to reside permanently in the United States while under the age of eighteen years." In *Nwozuzu v. Holder*, the Second Circuit clarified this phrasing, stating that "[a] petitioner could satisfy the requirements of section 321(a)(5) in two ways." 726 F.3d 323, 325 (2d Cir. 2013).

> Under the first clause, a minor who was a lawful permanent resident automatically became a citizen at the time the last parent was naturalized. Under the second clause, a minor could derive citizenship if, after the last parent naturalized, he 'beg[an] to reside permanently in the United States while under the age of eighteen years.'"

*Id*. In *Nwozuzu*, the court further stated "to 'reside permanently' in section 321(a) requires something less than a lawful admission of permanent residency," *id*. at 328 (*citing Ashton v. Gonzales*, 431 F.3d 95, 99 (2d Cir.2005)), while at a minimum requiring "some objective official manifestation of the child's permanent residence." *Id*. at 333.

In the instant case, Respondent began residing permanently in the United States in 1983, when she entered the country at JFK airport. *See* Tabs B-C. That Respondent intended for her residence in the United States to be permanent is evidenced by the fact that she has never returned to Liberia. Tab B at 9. In her declaration, Respondent states that when she left for the United States, she knew that she was moving there permanently. *Id*. at 8. Moreover, before her eighteenth birthday, Respondent manifested her intent to reside here permanently by giving birth to two USC children, Kevin Kiadii and La'Shara Kiadii. *See* Tab H, Birth Certificate of Kevin Kiadii, dated September 30, 1987; Tab I, Birth Certificate of La'Shara Lucia Kiadii, dated March 17, 1990.

    B.    <u>This Court Should Order the Release of Ms. Kiadii Because Respondent Has Established Probative Evidence of United States Citizenship</u>.

In a policy memorandum dated November 10, 2015, former Director of ICE, Sarah Saldaña instructs all ICE officials that "[a]s a matter of law, ICE cannot assert its civil

immigration enforcement authority to arrest and/or detain a U.S. citizen." Tab R. Where there is "probative evidence of [an individual's] U.S. citizenship," ICE is required to release that individual. *Id*. at XX. The "probative evidence of U.S. citizenship" standard is lower than the preponderance of the evidence standard, and is met where "the evidence before the agency tends to show that the individual may, in fact, be a U.S. citizen." *Id*.

In the instant case, Respondent has unequivocally established "probative evidence of U.S. citizenship" via the evidence contained herein. Pursuant to its own internal guidance, ICE is required to release the Respondent, and this Court should order ICE to do so.

## IV. CONCLUSION

For the foregoing reasons, this Court should terminate proceedings and should release Respondent pending resolution of the instant motion .

A proposed Order is enclosed.

        Respectfully submitted,

        THE LEGAL AID SOCIETY
        IMMIGRATION LAW UNIT
        Perry McAninch, Law Graduate
        Sarah T. Gillman, Supervising Attorney
        Seymour James, Attorney-in-Chief
        Adrienne Holder, Attorney-in-Charge
        Hasan Shafiqullah, Attorney-in-Charge,
        Immigration Law Unit
        199 Water Street, 3rd Floor
        New York, NY 10038
        (212)577-3393
        F: (646) 616-4151
        pmcaninch@legal-aid.org

By: _____
        Perry McAninch

## **TABLE OF CONTENTS**

**TAB**                                                        **PAGE**

**Documents Related to Respondent's Detention and Removal Proceedings**

**A.** Copy of the Notice to Appear and documents thereto ...........................................................1

**Declarations and Country Conditions**

**B.** Declaration of Ramatu Kiadii Soko, dated February 20, 2018 ............................................8

**C.** Declaration of Louise Roberts, dated February 17, 2018, together with a copy of her New York driver license ................................................................................11

**D.** Declaration of Dr. John Singler, Professor Emeritus of Linguistics at the New York University, together with a copy of his curriculum vitae ................................15

**Birth Certificates and Family Documents**

**E.** Copy of Respondent's birth certificate, dated November 12, 1972 ...................................35

**F.** Copy of the birth certificate of Louise Roberts, dated July 26, 1939 ................................36

**G.** Copy of the birth certificate of Desire Konkai Kiadii, dated August 28, 1971 ...................................................................................................................................37

**H.** Copy of the birth certificate of Kevin Kiadii, dated September 30, 1987 .........................38

**I.** Copy of the birth certificate of La'Shara Lucia Kiadii, dated March 17, 1990 ...................................................................................................................................39

**J.** Copy of the birth certificate of Anthony Maxwell Pratt, dated May 9, 1992 ....................40

**K.** Copy of the birth certificate of Yasmeen Madusu Soko, dated December 17, 2005 ..............................................................................................................................41

**L.** Copy of the birth certificate of Mariama Nadia Soko, dated January 27, 2008 ..................................................................................................................................42

**M.** Copy of the certificate of naturalization of Henry Kiadii, dated August 14, 1987 ...................................................................................................................................43

**N.** Copy of the certificate of naturalization of Louise Roberts, dated November 2, 1995 ...........................................................................................................44

**O.**     Copy of the certificate of naturalization of Mollie Soko, dated July 27, 2006 ..................................................................................................................... 45

**P.**     Copy of the marriage certificate of Ramatu Kiadii Soko and Mollie Soko, dated August 7, 2003 ........................................................................................... 46

**Q.**     Copy of the marriage certificate of Louise Roberts and Edmond Appiah, dated September 18, 1997 ..................................................................................... 47

**Immigration and Customs Enforcement Guidance**

**R.**     U.S. Immigration and Customs Enforcement, Policy Number 16001.2, *Investigating the Potential U.S. Citizenship of Individuals Encountered by ICE* (Nov. 10, 2015) ................................................................................................ 48

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**NEW YORK, NY**

_____
                                                          )
In the Matter of:                                )
                                                          )
**Ramatu KIADII**                            )        A# 097-421-333
                                                          )
     In removal proceedings.             )
_____)

**ORDER OF THE IMMIGRATION JUDGE**

Upon consideration of the respondent's Motion to Terminate, it is HEREBY ORDERED that the motion be ____ GRANTED _____ DENIED because:

  □ DHS does not oppose the motion.
  □ The respondent does not oppose the motion.
  □ A response to the motion has not been filed with the court.
  □ Good cause has been established for the motion.
  □ The court agrees with the reasons stated in the opposition to the motion.
  □ The motion is untimely per _____.
  □ Other:

_____          _____
Date                                                                      Immigration Judge Mulligan

_____

Certificate of Service

This document was served by:          [ ] Mail         [ ] Personal Service
To: [ ] Alien    [ ] Alien c/o Custodial Officer        [ ] Alien's Atty/Rep    [ ] DHS
Date: _____

By: Court Staff _____

**DETAINED**

**Ramatu KIADII**
**A# 097-421-333**

## PROOF OF SERVICE

I, Perry McAninch, hereby certify that on February 21, 2018, I caused a copy of the foregoing MOTION TO TERMINATE and Proposed Order to be served via hand delivery to the Department of Homeland Security, Immigration and Customs Enforcement, Office of Chief Counsel at the following address:

Office of Chief Counsel
26 Federal Plaza, Room 1130
New York, New York 10278

2/21/2018_____          _____
Date                                                               Perry McAninch